Judgment rendered May 25, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 54,251-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                      Appellee

versus

CAMERON KINTE MAYS                      Appellant

* * * * *

Appealed from the
Third Judicial District Court for the
Parish of Lincoln, Louisiana
Trial Court No. 63,486

Honorable Thomas W. Rogers, Judge

* * * * *

LOUISIANA APPELLATE PROJECT            Counsel for Appellant
By: Mary Constance Hanes

JEFFREY M. LANDRY                      Counsel for Appellee
Attorney General

MADELEINE SLAUGHTER-YOUNG
MICHELLE ANDERSON THOMPSON
CHRISTOPHER N. WALTERS
Assistant Attorneys General

* * * * *

Before PITMAN, STONE, and COX, JJ.

**PITMAN, J**.

A jury convicted Defendant Cameron Kinte Mays of aggravated kidnapping; aggravated burglary; unauthorized use of a motor vehicle; unauthorized use of an access card of $500 or more but less than $1,500; and second degree murder. The trial court sentenced him to concurrent sentences of life imprisonment at hard labor without benefit of parole, probation or suspension of sentence for aggravated kidnapping; 30 years at hard labor for aggravated burglary; 10 years at hard labor for unauthorized use of a motor vehicle; 5 years at hard labor for unauthorized use of an access card; and life imprisonment at hard labor without benefit of parole, probation or suspension of sentence for second degree murder. Defendant appeals. For the following reasons, we affirm his convictions and sentences.

## FACTS

On October 4, 2012, a grand jury indicted Defendant for aggravated kidnapping; aggravated burglary; unauthorized use of a motor vehicle; unauthorized use of an access card in the amount of $500 or more but less than $1,500; and second degree murder. It alleged that he committed these crimes on or about June 6, 2012, and that the victim was Susan Hashway. Defendant entered pleas of not guilty.

On March 29, 2019, the State filed a notice of intent to introduce other crimes evidence. It intended to introduce evidence that Defendant was convicted in Docket #63,487 (the "S.K. case") of possession of a firearm by a convicted felon, aggravated kidnapping and aggravated rape, which were committed two days before the crimes alleged in the instant case. A hearing was held on April 16, 2019.

On April 22, 2019, the trial court filed a ruling, finding that the cases were distinctively similar in the following respects:

> (1) the time and locations were close together, occurring on June 4 and June 6 on Roberts Street and Paynter Drive in Ruston; (2) the victims were single women that were home alone; (3) the victims' heads were covered with sacks and their hands were bound with cords from their own residences; (4) the victims' cars were driven by a perpetrator at the same credit union and to Vanessa Mays' apartment on West Alabama in Ruston; and (5) the victims' ATM cards were used to obtain $500 in cash.

The trial court found that the introduction of the other crimes evidence was relevant to show modus operandi, intent and identity and that its probative value outweighed the prejudicial effect to Defendant.

A jury trial began on April 29, 2019. David Elleson testified that he was Hashway's neighbor and that she was in her 60s, widowed and lived alone. He stated that on the morning of June 8, 2012, his wife answered a telephone call from Hashway's sister, who had not heard from her in several days and asked the Ellesons to check on her. Elleson went to Hashway's house, rang the doorbell and knocked on the door. When he did not receive a response, he tried the door handle, the door opened and he entered the house. He looked for her in the house and yard and called her name but could not find her. He then found her in a downstairs bathroom, lying face down in the bathtub with her hands tied behind her back and her feet tied together. He called her name but did not receive a response, he did not see her move or make a sound and he did not touch her body. He immediately left the house and called the police. An officer arrived within ten minutes, and he showed the officer the location of Hashway's body. He noted that the house appeared to be ransacked and that it was unusual for bottles of alcohol to be on the floor. He discussed some of the electronics he

2

previously observed in her house, including a Wii gaming console. He stated that there was a box for a television on the curb outside her home several days prior. He noted that her garage door was generally open several inches so her cats could come and go.

Curtis Hawkins testified that on June 8, 2012, he was employed by the Ruston Police Department and was dispatched to 2901 Paynter Drive at 7:48 a.m. following a 911 call made by Elleson. Hawkins met Elleson at Hashway's house, and they walked through the house to the location of her body. He observed her body in a bathtub and determined from her condition that she was deceased—she was not moving, her blood had moved toward the lower points of her body and she had defecated on herself. He noted that her ankles were tied with cord, her hands and wrists were tied behind her back with a different cord and there was a pillowcase over her head. He recalled that the house appeared to have been rummaged through—cabinets were open, bottles had been removed from a liquor cabinet and placed on the floor and a television had been removed. He stated that the contents of Hashway's purse were on the floor, which included an open wallet, her driver's license and a bank statement.

Frank Peretti, MD, who was accepted as an expert in the field of forensic pathology, testified that he performed Hashway's autopsy on June 9, 2012. He stated that when he received the body, it was decomposing. He noted that the body was received with a blood-soiled pillowcase and was clad in a nightgown; that the hands were tied multiple times about the wrists with a telephone cord and that the bindings were soiled with feces; and that the ankles were bound with a phone charger. He testified that the body had traumatic injuries, including bruising and lacerations on the face and scalp,

3

which are signs of blunt force injuries. He noted that the left eye showed multiple scleral and conjunctival petechial hemorrhages along with a wide skull hemorrhage, which are signs that there was an obstruction in the blood flow to the head. He stated there were no injuries to the chest, abdomen, anus or vagina. He collected strands of hair from the upper and lower extremities and noted that the fingernails were intact. He stated that there were contusions and bruises surrounding the bindings on the hands and feet, which demonstrated that Hashway was alive when her hands and feet were bound. He noted contusions and bruising on the inner thighs and a scrape on the left knee. Dr. Peretti determined the cause of Hashway's death to be asphyxia and head injuries with ligature bindings on the upper and lower extremities with contributory factors of arteriosclerotic cardiovascular disease and obesity. He stated that it is unknown how the asphyxiation happened, but he could rule out manual strangulation.

Michael Lestage testified that on June 8, 2012, he was employed by the Ruston Police Department and assisted in the Hashway investigation. After midnight on June 9, 2012, he went to 2901 Paynter Drive to retrieve and secure Hashway's vehicle, a Toyota Rav4, which he located in the garage. He noted that the vehicle was unlocked, and its keys were located on the driver's side floorboard. He turned the car on to the accessory position to load it on the tow truck and noted that the windshield wipers started moving and that the radio played a rap and hip hop music station.

Michael Swallow of the Ouachita Parish Sheriff's Office was accepted as an expert in crime scene investigation. He testified that on June 8, 2012, he was called to 2901 Paynter Drive where he photographed and videoed the scene. His video was played for the jury while he explained

4

what was being shown. He noted a wallet on the floor with a driver's license and receipt from Iberia Bank; a room with open cabinets; an area where it appeared a television was missing; and Hashway's body. He also identified photographs of the crime scene, including one of the downstairs bedroom that showed pillows with pillowcases and a pillow without a pillowcase and compared the pillowcases in the photograph with the pillowcase found over Hashway's head.

Clint Williams testified that he is the Deputy Chief of Police for Administration Investigations with the Ruston Police Department. He stated that on June 4, 2012, he was working in the Criminal Investigations Department and became involved in the investigation of the rape of S.K. when she gave a statement about the events of that morning. S.K. and her roommate lived at 503 Robert Street, and the rape occurred at the residence. S.K. reported that she was home alone and woke up to two men burglarizing the house. She stated that one of the men tied her up and raped her on the couch of the living room; he placed her in the passenger seat of her vehicle (a white Ford Mustang), covered her with a blanket and drove her to a residence where he untied her and put her in the driver's seat; he hid in the back seat and forced her to drive to a Centric Bank and withdraw $500 from the ATM; and then he placed her in the passenger seat, tied her up and covered her again and drove her around. S.K. reported that the man who raped her was armed with a gun, struck her with the gun, threatened to kill her and told her not to call the police. Williams noted that S.K.'s garage door was left up; that a witness observed Defendant driving S.K.'s vehicle at the Alpine Villa Apartments; and that the perpetrators stole her driver's license and electronics, including televisions, a DVD player and a laptop.

5

He also stated that when S.K. was raped, her head was covered and her hands were tied behind her back with the cord of a hair-straightening iron. He stated that video footage from the bank showed S.K. driving to an ATM to retrieve money in the early morning of June 4, 2012.

Williams further testified that on June 5, 2012, Thomas Evans of the Lincoln Parish Narcotics Enforcement Team contacted him regarding a laptop missing from 503 Robert Street and stated that he had an informant, Kevin Owens, who could purchase the stolen laptop. Owens purchased the laptop from Vanessa Mays, who had been given the laptop by Defendant. Evans retrieved the laptop, and it was determined that it belonged to S.K.'s roommate. An arrest warrant was prepared for Defendant based on Owens's statement that Defendant told him he had a laptop to sell and that Vanessa was in possession of the laptop. Defendant was arrested at approximately 4:00 p.m. on June 6, 2012, at the Alpine Villa Apartments. Defendant was then transported to the Ruston Police Department, where he was patted down and allowed to go to the restroom. Williams stated that during the pat down, officers noted a credit card in Defendant's wallet that did not bear his name. Officers allowed Defendant to keep the wallet, and when he returned from the bathroom, the credit card was missing from the wallet. Williams explained that they were looking for items belonging to S.K. in Defendant's possession.

Williams also testified that during the investigation of the S.K. case, evidence was gathered from 503 Robert Street, including a cigarette butt found behind the house, which was later determined to contain DNA that matched Defendant. Keys were recovered from the couch where S.K. was raped, and the keys opened the lock on the trailer where Defendant resided.

6

Defendant's fingerprints were on an open condom wrapper found near the couch. His fingerprints were also found on the driver's side of S.K.'s vehicle. Williams stated that S.K. never saw the faces of the persons who entered her house but that she was able to identify their voices. Williams identified a handgun that Owens turned over to law enforcement that allegedly belonged to Defendant.

Williams further testified that on June 8, 2012, he became involved in the Hashway case investigation and looked for evidence of usage of her credit card. He noted that one of the last transactions on her card included a withdrawal of $502.75 at 4:52 a.m. on June 6, 2012, at the same Centric Bank ATM as in the S.K. case, followed by three attempted transactions at a Chase Bank ATM. Williams stated that through security footage, officers identified Vanessa as the person at the Centric Bank ATM. This video was shown to the jury. He noted that she was wearing a cross necklace in the video and that she was wearing the same necklace when she was arrested for illegal possession of stolen things regarding the laptop in the S.K. case. Williams stated that after Vanessa's arrest, officers interviewed her about the ATM withdrawal in the instant case, and she admitted to making the withdrawal of $500 at Defendant's request. She stated that Defendant drove Hashway's vehicle to the Alpine Villa Apartments and then drove her to Hashway's residence in the vehicle. Williams stated that Defendant was subsequently charged with the crimes involving Hashway.

Williams compared the S.K. case with the instant case and stated that in both cases, the crimes occurred in the early morning hours, both victims were females who were home alone, both victims' houses were burglarized with electronics stolen, both victims were tied up, and in a similar manner,

7

the residences were in close proximity, the victims' vehicles were used by the suspect to move stolen property or to transport the victim to the ATM, the victims' ATM cards were used at the same location and the crimes were committed within two days of each other.

On cross-examination, Williams stated that Vanessa denied selling the laptop to Owens. He noted that Owens also claimed to have a gun that came from Defendant but that officers had not confirmed this. He stated that he found a used condom in an outdoor trash can at the Robert Street residence and that no DNA could be obtained from it.

Thomas Evans of the Ruston Police Department and the Lincoln Parish Narcotics Enforcement Team testified that on June 4, 2012, Owens contacted him and asked if he was aware of what had occurred. Evans explained that Owens worked for him for several months as an informant and purchased controlled dangerous substances. He stated that Owens's call was "out of the blue" and stated that "something bad had happened to some girls." Evans then contacted the Criminal Investigation Division and learned that a rape had taken place that morning. He met with Owens, who told him he could contact the person who committed the rape. Owens made a recorded phone call to this person in Evans's presence. Evans explained that the person on the phone said that what happened the prior night was "really, really bad" but minimized the sexual assault. Evans then asked Owens to try to purchase a laptop because one had been removed from S.K's house. He provided Owens with money to make the purchase, and Owens purchased the laptop from Vanessa. Evans then turned the laptop over to Williams. Evans also participated in the arrest of Defendant. He stated that he was responsible for perimeter security while officers searched Vanessa's

apartment, and he observed a garbage bag full of liquor bottles behind the apartment. He noted that the garbage bag had been there for a short period of time because it was not covered with rainwater or any debris. He noted that they later gave Owens money in exchange for a handgun that may have belonged to Defendant.

Eric Hanna testified that on June 4, 2012, he was employed by the Ruston Police Department and was in charge of the Criminal Investigations Division. He was on vacation when the crimes against S.K. and Hashway occurred but returned home early when he received a call about Hashway's murder to assist in the investigation. He helped procure Hashway's bank records and the ATM videos from Centric Bank and Chase Bank. He went to Hashway's house and met with her sister, and they determined that two televisions, a Toshiba Tablet and a digital camera were missing. Through an interview with Brandon Bonton, a friend of Defendant, he learned that the digital camera had been in Defendant's possession before being thrown from a vehicle. While in the house, he observed the liquor cabinet and its contents. He was also aware of the liquor bottles found behind Vanessa's apartment. Hashway's sister confirmed that at least three of the brands found behind the apartment were consistent with what Hashway normally kept in her liquor cabinet.

Michael Baxter testified that in June 2012, he was employed by the Ruston Police Department in the Criminal Investigation Division. On June 8, 2012, he was called to 2901 Paynter Drive to assist with an investigation. He observed Hashway's body in the bathtub and that her hands and feet were bound. He identified photographs of what he observed. He noted that her body was at an angle, with her feet above the rear of the

9

bathtub. He stated that her lower body was exposed, a nightgown covered part of her body and that he could not see her head. He stated that the house was in disarray, that items had been moved and that items were strewn throughout the entire first floor. He determined that televisions and liquor bottles were missing from the house. He noted that a wallet and mail were on the floor and that after matching credit cards and bank statements, they discovered that a bank card was missing. He reviewed video footage from the ATMs and observed both Hashway and others using her card in the videos. A video of Hashway withdrawing money at 1:08 p.m. on June 4, 2012, from an ATM in West Monroe, was shown to the jury. In the video, she is driving a small red SUV, which appeared to be the same vehicle found in her garage and had the same license plate number. The jury also viewed footage of Hashway in her SUV at an ATM in Ruston at 11:46 a.m. on June 5, 2012. Baxter explained that knowing she was alive at this time helped determine when the crime was committed. Footage from the ATM at Centric Bank at 4:52 a.m. on June 6, 2012, was shown to the jury. In this video, Vanessa, who is wearing a wooden cross necklace, is seen approaching the ATM, and bank statements show she used Hashway's card to withdraw $502.75. According to bank statements, Hashway's debit card was next used at a Chase Bank ATM. The jury viewed three video clips from Chase Bank beginning at 5:36 a.m. on June 6, 2012. The face of the person who made the transaction is not shown in the video.

Baxter testified that he also assisted in the investigation of the S.K. case. He stated that at 3:30 p.m. on June 8, 2012, he went to Vanessa's apartment to serve an arrest warrant for possession of stolen things. When Vanessa answered the door, she was wearing a wooden cross necklace like

the one seen in the video footage at the Centric ATM. He noted that other officers secured the perimeter and discovered a garbage bag full of liquor bottles. Officers believed these bottles were the ones missing from Hashway's house. He stated that at this point, the S.K. and Hashway cases became intertwined. After obtaining a search warrant, they searched Vanessa's apartment and found items likely related to the S.K. and Hashway cases. They also found a tube top similar to the top Vanessa was wearing in the ATM footage.

S.K. testified that in June 2012, she was 20 years old, lived at 503 Robert Street in Ruston where she was attending Louisiana Tech and drove a white Ford Mustang. She stated that on the evening of June 3, 2012, she was home alone because her roommate was at her boyfriend's house. Her roommate did not close the garage door, but S.K. intended to close it before she went to bed. She fell asleep on the couch in the living room and did not close the garage door, and the door between the garage and the house was unlocked.

S.K. testified that she woke up to voices; and, as she walked to her room, a man jumped out from behind a kitchen cabinet, pinned her against the wall and covered her mouth when she screamed. She could not see his entire face because it was covered with a bandana from the nose down, but she could tell he was a black man. She then saw a second black man who had a larger build and a deeper voice than the first man. She stated that the first man had a gun and put it beside her head when he pinned her to the wall. She testified that the second man went through items in the house while the first man led her to the couch, laid her on her stomach, tied her hands behind her back with a cord, covered her head with a sack and raped

11

her. Before the first man raped her, he asked if there were condoms in the house, and she told him they were in the bathroom. She could not recall hearing him open a condom wrapper but noted that law enforcement found a wrapper in the living room. She stated that after he raped her, he put her underwear back on her and rolled her over, and the second man covered her head with a blanket. The men found her purse, and the first man removed the head covering to confirm a debit card was hers. The second man then put her in the passenger seat of her car and covered her head with a blanket. She noted that the second man was not involved again after these actions.

S.K. testified that the first man got into the driver's seat, drove for a bit and then pulled into a driveway, where he showed her that he had a gun. He made her get into the driver's seat and drive to the bank so she could use the ATM. At the ATM, she withdrew $500, which was the maximum amount she could take out, and gave it to the man. As she drove them back to her house, the man hit her from behind on the side of her head because he thought she was trying to see his face in the rearview mirror. Once they returned to her house, the man tied her hands behind her back again, made her sit in the passenger seat and put a blanket over her head. He then drove them to another location where he exited the car for five to ten minutes. When he got back into the vehicle, he joked that now they were going to kill her. He then drove her back to her house. While he was looking for something in the trunk, she freed her hands, got out of the vehicle, ran inside the house and locked the doors. She noted that she did not have her keys or phone because the man took them. She later noticed that three televisions, DVD players and her roommate's laptop were missing. She used her laptop to message her roommate, and her roommate returned home at

12

approximately 6:30 a.m. Her roommate noticed that the house had been ransacked, and they left the house and drove to the Ruston Police Department. S.K. stated that she previously testified at a trial about these events and that Defendant was convicted in that trial. The bill of indictment and minutes of the jury trial in the S.K. case were admitted into evidence.

On cross-examination, S.K. agreed that she never identified the first man as Defendant. She stated that she never testified against the second man because he is missing.

Robert Demps testified that in 2012, he lived at the Alpine Villa Apartments with Vanessa and his girlfriend Markeva Day. Defendant came to the apartment to see his cousin Vanessa. Demps saw Defendant with a black semi-automatic pistol several times and heard Defendant talk about "hitting a lick." He testified that Defendant usually walked to the apartment but that on the early morning of June 4, 2012, Defendant arrived driving a white Ford Mustang. Demps noticed a young woman in the passenger seat with a towel over her head. He explained that Defendant was looking for Vanessa, but he left when Vanessa did not come outside. Two days later, Defendant arrived at the apartment around 3:00 or 4:00 a.m. with two televisions and a Wii console. Defendant asked Demps to follow him "to [his] girl's house," so Defendant drove away with Vanessa in a red SUV, and Demps and Day followed in another vehicle. Demps noted that it was dark and raining. They followed Defendant to a house, and Defendant opened the garage door and drove the vehicle into the garage. Defendant and Vanessa then got into the vehicle with Demps and Day, and Defendant asked if they wanted to go inside and see a body. Defendant then told Day to drive him to the bank. When they arrived at Centric Bank, Defendant and

13

Vanessa exited the vehicle for a few minutes and then got back in. They dropped Defendant off at a Chase Bank and went to the McDonald's in the same shopping center. They picked up Defendant and went to a gas station, where Vanessa paid for the gas. They then returned to the Alpine Villa Apartments, where Defendant told them he tied up, hit with a pistol and killed a woman at the house where he took the SUV. Defendant explained that he had to kill the woman because if he did not, she would call the police. Demps stated that he did not believe Defendant committed murder because his tone was "normal." Demps admitted that he moved the televisions and Wii console to another apartment because he knew they were stolen. Demps stated that Defendant also brought alcohol in a garbage bag to the apartment later that day. Demps was interviewed by law enforcement, arrested and charged as an accessory after the fact.

Vanessa Mays testified that Defendant is her cousin, that he had a semi-automatic pistol and that he did not have a vehicle. She lived in the Alpine Villa Apartments, Defendant lived in a trailer down the street from the apartments and Owens lived in a house in front of the trailer. In the early morning hours of June 4, 2012, Defendant arrived at her apartment, but she did not get up. She later talked to him about the girl in the Mustang with him that morning, and he told her S.K. was his girlfriend. Defendant told Vanessa that he "hit a lick" (robbed) the night before and gave her a DVD player. She noted that he told her about going into peoples' houses and that it excited him if people were home when he was there.

Vanessa further testified that on June 5, 2012, Bonton was at her apartment with Defendant, who had a gun. Defendant asked Bonton for a ride, and Bonton dropped off Defendant in a neighborhood. Later that

14

evening, Defendant called Vanessa multiple times; and, at approximately 4:00 a.m., he arrived at her apartment. She stated that Defendant had just hit a lick; and she, Demps and Day helped him unload televisions, equipment, electronics, power tools, a Wii console and two laptops from a red SUV. He then asked Vanessa to ride back with him while Demps and Day followed, and they listened to rap music while in the SUV. When they arrived at a house, Vanessa got in the car with Demps and Day, Defendant put the SUV in the garage and then he got in the car with them. He asked if they wanted to go inside and see a body. When she asked "what body," Defendant explained that the woman put up a fight and she "had to go" because she was going to call the police. Vanessa stated that they did not believe him at first because she "never knowed him as no killer."

Vanessa testified that Defendant then told Days to drive to the Centric Bank. When they arrived at the bank, Vanessa got out of the car. Defendant told her to put something over her face but she declined. She then used a debit card that Defendant took from the woman and used the PIN he gave her to withdraw $500 from the ATM. She explained that Defendant wanted her to test the PIN and to check the account balance. She knew she had committed a crime and that she was on video at the ATM wearing a cross necklace and a tube top. She stated that they then drove to a Chase Bank and dropped off Defendant while they went to McDonald's. Defendant called her because he could not remember the account PIN, and she pretended to have forgotten because she was starting to believe that he harmed the woman. Defendant joined them, they went to a gas station and then they returned to the apartment. While they were in the car, Defendant said he killed the woman by tying her up and drowning her in the bathtub.

15

He stated that he had to kill the woman because she was going to call the police but that he did not kill S.K. because she was not going to tell on him. When they returned to the apartment, they moved the stolen items to a vacant apartment. Defendant also brought two garbage bags of liquor bottles to the apartment, and they put the bags outside. Defendant then made calls to sell the items.

Vanessa testified that the next day, Defendant came to the apartment to get his gun. She then left to get something to eat. On her way home, she noticed law enforcement surrounding the area. She called Defendant and told him to get rid of the things he had because he was surrounded. She then learned Defendant had been arrested. She was arrested on June 8, 2012, told law enforcement about her involvement with the ATM card and was charged with accessory after the fact to second degree murder, accessory after the fact to aggravated battery, two counts of illegal possession of stolen things (the liquor bottles and a DVD player) and unauthorized use of an access card. She pled guilty to the five charges and served time in prison. She stated that she testified in the S.K. trial.

On cross-examination, Vanessa testified that she was taking promethazine for nausea because she had had surgery two weeks prior. Defense counsel moved for a mistrial, arguing that she was under the influence of a drug and might not be capable of testifying. The trial court denied the motion. When asked about her drug usage, Vanessa stated that she uses marijuana daily and that she used crack cocaine in early 2012. She noted that on June 6, 2012, she saw Defendant wearing bloody gloves when he brought the stolen items to the apartment. She also testified that she did not sell a laptop to Owens.

Brandon Bonton testified that he met Defendant in 2011 when he was a student at Louisiana Tech. They exchanged phone numbers, texted and spoke on the phone. He also gave Defendant rides because Defendant did not have a car. He was aware Defendant possessed three guns, i.e., a .38 special revolver, a CZ 52 and a silver 9 millimeter with a black pistol grip. He borrowed the CZ 52 from Defendant but returned it to him in the late hours of June 4, 2012. He stated that Defendant was going to use the gun to hit a lick. Bonton testified that in the week leading up to the events in this case, Defendant told him that he was casing houses but never asked him to participate or help when hitting a lick.

Dr. Jessica Esparza testified that she is a DNA Technical Leader at the North Louisiana Crime Lab and was accepted as an expert in the field of DNA analysis. In 2012, the Ruston Police Department submitted 26 pieces of evidence, including reference samples from Defendant and Hashway, a pillow case, ligatures from Hashway's hands, Hashway's nightgown, Hashway's ring, Defendant's clothing, hairs found on Hashway's body, her fingernail clippings, vaginal and anal swabs from the autopsy exam, swabs from Hashway's vehicle, adhesive lifts, a garage door opener and a television remote control. She testified that she did not find any DNA associated with Defendant on the items analyzed. In 2019, several items were resubmitted for analysis. Dr. Esparza re-analyzed the pillowcase, but the DNA was insufficient to make any conclusions. She also re-analyzed the remote control and the garage door opener and found no amplifiable DNA on the items.

The State proffered copies of Defendant's text messages to Bonton. It then re-called Bonton. He testified that on June 4, 2012, he woke up to a

17

text message from Defendant.  Bonton read a copy of the message for the jury, which stated, "It's done like a gangster then took the bitch on a ride in her Mustang blindfolded brought her to Alpine."  Bonton stated that after he read the text message, he was shocked.  Later that day they met at the Alpine Villa Apartments and talked about the text message.  Defendant told Bonton that he went to a girl's house, she was home alone, he tied her up, he covered her head in the car and he took her to an ATM to take money out of her bank account.  Bonton saw Defendant on the evening of June 5, 2012, at the Alpine Villa Apartments and noted that he was carrying a gun.  Sometime between 10:00 p.m. and midnight, Defendant asked Bonton for a ride, Defendant gave directions and Bonton dropped him off.  Bonton identified a photograph of Hashway's house on Paynter Drive as the area where he dropped off Defendant.  On June 6, 2012, between approximately 7:00 and 9:00 a.m., he returned to the apartments where he saw Day and Demps outside and described their faces as having "bug eyes" and appearing to be "bothered" or "disturbed."  He met Defendant in the vacant apartment and saw him pull items from a closet, including a drill set, a television and a digital camera.  Defendant told Bonton that he "hit the house last night" and he "killed that bitch."  Defendant then asked Bonton to take him and the items to Defendant's girlfriend's house.  Bonton helped Defendant put the items in the car and drove him to his girlfriend's house.  He described Defendant as "unbothered" and that Defendant told him about breaking into Hashway's house.  Defendant told him that he tied her up, she put up a fight and he put her in the bathtub with water, covered her head and choked her until she turned blue.  Defendant also told him that he wore gloves.  Bonton dropped off Defendant and the items at the girlfriend's house and left.  He

18

noticed that Defendant left a stolen digital camera in the vehicle, so he threw it out of the window. Bonton was arrested and charged with accessory after the fact.

The State also re-called Williams. He identified a cellphone that was seized from Defendant at the time of his arrest. He obtained a search warrant, and Verizon Wireless provided data from the cellphone for the dates of June 1 to June 8, 2012. He discussed outgoing text messages from June 6, 2012, and their content including "TV laptop," "Dead," "42 inch Vizio first come first serve," "laptop TV Tablet" and "Ima lay low and quit hustling for a few weeks. I'm talking two jobs straight legal."

The State rested, and the defense presented witnesses. Demps testified that in the early morning hours of June 6, 2012, he saw Defendant in his living room with electronics. He did not open the door for Defendant, did not help load items into a red SUV and did not see him with bloody gloves. He stated that if Vanessa testified to these things, she was lying.

Markeva Day testified that on June 6, 2012, Defendant needed her to follow him to "his girls house" to drop off her car. She stated that she never saw electronics in the living room or Defendant wearing bloody gloves.

The defense rested.

On May 4, 2019, a unanimous jury found Defendant guilty as charged of aggravated kidnapping; aggravated burglary; unauthorized use of a motor vehicle; unauthorized use of an access card of $500 or more, but less than $1,500; and second degree murder.

On June 25, 2019, a sentencing hearing was held, and the trial court noted the sentencing ranges for each charge. It sentenced Defendant to the maximum sentence allowed by law on each conviction, i.e., life

19

imprisonment at hard labor without benefit of parole, probation or suspension of sentence for aggravated kidnapping; 30 years at hard labor for aggravated burglary; 10 years at hard labor for unauthorized use of a motor vehicle; 5 years at hard labor for unauthorized use of an access card; and life imprisonment at hard labor without benefit of parole, probation or suspension of sentence for second degree murder. It ordered that these sentences be served concurrently with each other but consecutive to the sentences in the S.K. case.

On November 4, 2019, Defendant filed a pro se application for post-conviction relief. He argued that he was denied the right to a direct appeal and requested an out-of-time appeal. On March 9, 2021, the trial court filed a ruling granting Defendant an out-of-time appeal.

Defendant appeals.

## DISCUSSION

*Other Crimes Evidence—Preservation for Appeal*

In his first assignment of error, Defendant argues that the trial court abused its discretion in granting the State's motion to introduce other crimes evidence relating to his convictions in the S.K. case.

The State argues that, by failing to raise a contemporaneous objection at trial to the introduction of witness testimony and documentary evidence of other crimes, Defendant waived his right to appellate review.

An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. La. C. Cr. P. art. 841(A). In order to preserve an issue for appellate review, a party must state an objection contemporaneously with the occurrence of the alleged error, as well as the grounds for the objection. *State v. Boyette*, 52,411 (La. App. 2 Cir. 1/16/19),

264 So. 3d 625. If no objection is made in the trial court, any error committed therein is not preserved for appellate review. *State v. Lloyd*, 48,914 (La. App. 2 Cir. 1/14/15), 161 So. 3d 879, *writ denied*, 15-0307 (La. 11/30/15), 184 So. 3d 33.

A review of the record shows that Defendant did not raise a contemporaneous objection at trial to the introduction of any witness testimony or evidence of other crimes. During the trial, defense counsel noted, outside the presence of the jury, that he would not object to the introduction of other crimes evidence because of the trial court's pretrial ruling on the matter. Throughout the trial, Defense counsel cross-examined the State's witnesses regarding the S.K. case and responded "no objection" to the evidence admitted regarding the S.K. case.

Accordingly, this assignment of error was not preserved for appellate review.

*Ineffective Assistance of Counsel*

In his second assignment of error, Defendant argues that if his attorneys failed to preserve for appeal the objection to the introduction of other crimes evidence, they rendered ineffective assistance of counsel. He contends that counsel failed to object to the trial testimony regarding prior offenses and to the introduction of the minutes from the S.K. trial that showed he was convicted of rape and kidnapping. He contends that this performance was deficient and prejudiced him.

The State argues that although Defendant raises the issue of ineffective assistance of counsel on appeal, he has not briefed the issue and that the record is insufficient to show the reasoning and strategy behind counsel's actions.

A claim of ineffective assistance of counsel is generally not urged on appeal but, instead, is raised in the trial court through the means of an application for post-conviction relief. *State v. Robertson*, 53,970 (La. App. 2 Cir. 6/30/21), 322 So. 3d 937. However, when the record is sufficient, an appellate court may resolve this issue on direct appeal in the interest of judicial economy. *Id.*

The right of a defendant in a criminal proceeding to the effective assistance of counsel is mandated by U.S. Constitutional Amendment VI. *State v. Spruell*, 52,575 (La. App. 2 Cir. 4/10/19), 268 So. 3d 397, *writ denied*, 19-00719 (La. 2/10/20), 292 So. 3d 63, and *writ denied*, 19-00752 (La. 2/10/20), 292 So. 3d 64, *citing State v. Wry*, 591 So. 2d 774 (La. App. 2 Cir. 1991). A claim of ineffective assistance of counsel is analyzed under the two-prong test developed by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To prevail, the defendant first must show that counsel's performance was deficient, i.e., that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. *Id.* Second, the defendant must show that the deficient performance prejudiced his defense, i.e., that counsel's errors were so serious as to deprive the defendant of a fair trial and that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.*

A deficient performance is established by showing that the attorney's actions fell below the standard of reasonableness and competency required for attorneys in criminal cases and is evaluated from the attorney's perspective at the time of the occurrence. *State v. Robertson*, *supra*, *citing*

*Strickland v. Washington*, *supra*. A reviewing court must give great deference to the trial counsel's judgment, tactical decisions and trial strategy, strongly presuming he has exercised reasonable professional judgment. *State v. Robertson*, *supra*. A defendant making a claim of ineffective assistance of counsel must identify certain acts or omissions by counsel which led to the claim; general statements and conclusory charges will not suffice. *Id.*, *citing Strickland v. Washington*, *supra*.

Although ineffective assistance of counsel claims are more properly raised by an application for post-conviction relief, the record is sufficient to consider Defendant's allegations that his trial attorneys were ineffective for failing to object at trial to the introduction and admission of other crimes evidence. As discussed above, the record demonstrates that Defendant's trial counsel did not make such objections. However, trial counsel's actions were not a deficient performance but rather a strategic decision. At a pretrial hearing on the State's motion to introduce other crimes evidence, defense counsel presented arguments in opposition to the motion. At trial, Defense counsel stated that he would not make an objection to the introduction of other crimes evidence because the trial court ruled on the issue prior to trial. Defense counsel acted tactically and intentionally when making and not making objections throughout the trial. We give deference to counsel's actions and presume he exercised reasonable professional judgment at trial.

Accordingly, this assignment of error lacks merit.

## CONCLUSION

For the foregoing reasons, we affirm the convictions and sentences of Defendant Cameron Kinte Mays.

**AFFIRMED.**

23